944 A.2d 734

IN THE MATTER OF THE ESTATE OF SAMIA BALGAR.

Superior Court of New Jersey
Law Division Passaic County

Decided September 18, 2007.

*Daniel Jurkovic,* for Mary WanderPolo.

*Diane Marie Acciavatti,* for Nina Balgar.

RIVA, J.S.C.

Samia Balgar ("decedent") died on May 13, 2003, leaving her five daughters as her only heirs. Following decedent's death, Nina Balgar ("defendant"), who is one of decedent's daughters, filed with the Passaic County Surrogate the will decedent executed on April 15, 1995. In her will, decedent appointed defendant as executrix and directed that her estate be shared equally by defendant and her other four daughters ("plaintiffs").

Plaintiffs filed a caveat against the probate of the will. In September 2003, defendant filed a complaint and order to show cause, seeking to admit the will to probate. Plaintiffs filed an answer initially denying the validity of the will. In October 2003, the parties entered into a settlement in which the will was admitted to probate and defendant was directed to provide plaintiffs with an accounting of the assets, subject to their right to object to the accounting. The settlement also provided that the executrix would serve without commission and bond. The terms of the settlement were incorporated in a judgment entered in November 2003 by Judge Susan L. Reisner.

In May 2004, plaintiffs filed a complaint and order to show cause against defendant. This complaint was later amended in June 2004. The key allegation of the amended complaint was that defendant had coerced her mother into transferring most of her

assets into joint bank accounts which would pass to defendant on her mother's death, instead of going to each daughter equally.[1] The complaint also alleged that defendant had not provided an accounting of certain jewelry and personal items. In July 2004, the parties executed a consent order in which defendant agreed, pending trial of the issues, not to take further action with respect to any assets and that she would provide the requested accounting.

The issue of the disposition of the joint bank accounts was tried before Judge Margaret Mary McVeigh between February and May 2005 ("the joint accounts litigation"). Mary WanderPolo, who had been retained by defendant to represent the estate, represented defendant in this litigation. She argued that the proceeds of the joint accounts belonged to defendant as the surviving joint tenant. The trial took eight trial days and approximately fifteen witnesses testified. In June 2005, Judge McVeigh issued an oral opinion concluding that defendant had failed to rebut the presumption that she had unduly influenced her mother's establishment of the joint accounts. Judgment was entered accordingly.

Prior to the entry of judgment, the attorneys forwarded to the court competing forms of the judgment. Judge McVeigh ultimately signed the proposed judgment submitted by WanderPolo, which provided that the court retained jurisdiction to determine questions concerning administration of the estate, including the issue of whether legal fees and costs incurred by the parties should be paid by the estate.

Defendant appealed Judge McVeigh's decision. On appeal, defendant's sole argument was that the judgment was flawed by legal error in the application of the governing standard and by erroneous factual findings. The Appellate Division affirmed. *In*

---

[1] At the time of her death, the balance of the five accounts was $785,141.59. The total estate, including the proceeds of the joint accounts, approximates $1 million.

*re Estate of Samia Balgar,* No. A–6621–04T5, 2007 *WL* 1147081 (App.Div. April 19, 2007).

In the meantime, in July 2005, defendant retained Diane Acciavatti to replace WanderPolo as counsel. Notably, defendant refused to pay WanderPolo's outstanding legal fees dating back to July 2004.[2]

In late July 2005, plaintiffs filed a post-judgment motion seeking, among other things, clarification relating to plaintiffs' application for attorneys fees and removal of defendant as executrix. The motion was resolved by consent order entered in August 2006. The order states, in pertinent part, that "[t]he [c]ourt considered the issue of attorneys fees and has determined that each party shall pay its own attorneys fees and that the [e]state shall not be responsible for either parties' attorneys fees."

In December 2006, Judge McVeigh signed an order to show cause upon complaint filed by WanderPolo for an award of legal fees from the estate pursuant to *R.* 4:42–9 and to establish the fees as a priority lien against the estate. WanderPolo contended that she was entitled to fees from the estate as the initial estate attorney. She argued, alternatively, that attorneys fees related to an estate are properly paid from the estate, even if a court decides to apportion fees, and that she had a charging lien pursuant to *N.J.S.A.* 2A:13–5 on at least the portion of the estate that belongs to defendant. No petition for a charging lien was filed. Both plaintiffs and defendant opposed the application for fees from the estate. Defendant contended that the issue of legal fees had already been adjudicated by the court in August 2006 and that the estate was not responsible for payment of the fees.

On February 20, 2007, Judge McVeigh ordered that the estate pay WanderPolo's fees from the date of the first visit with defendant through the entry of Judge Reisner's judgment in November 2003, and that all other fees be paid by defendant. The judge previously articulated the reasons for her decision on the

---

[2] WanderPolo was paid $18,682.89 for legal services she provided the estate.

record on February 9, 2007. On that day, she stated that the relief sought by WanderPolo was "to require the estate of [decedent] to pay the legal fees of [WanderPolo]." She also noted that "[a]t the conclusion of that case [referring to the joint accounts litigation], this court ruled that each side was responsible for their own attorneys fees. This court still takes that position."

In March 2007, WanderPolo moved for reconsideration of Judge McVeigh's February 20, 2007 order—a motion that is currently pending. She claimed the order was deficient because it failed to specify not only the amount of the fee that defendant was responsible to pay to her, but also whether her application to have her fee paid from defendant's share of the estate was granted or denied.

Because of the Appellate Division's April 2007 decision, the restraints imposed by Judge McVeigh in July 2004 and later in August 2006 expired. Thus, in May 2007, plaintiffs moved for an interim distribution from the estate of $150,000 each. In response, WanderPolo cross-moved for partial temporary restraints and a charging lien pursuant to *N.J.S.A.* 2A:13–5. Once again, no petition for a charging lien was filed.

On June 1, 2007, Judge McVeigh approved an interim distribution of $100,000 to each of the five beneficiaries, but ordered that $50,000 of defendant's share be held in an attorney trust account pending a decision and entry of an order on the cross-motion. On that same day, defendant filed a legal malpractice complaint in the Essex County Law Division relating to WanderPolo's handling of the joint accounts litigation. In July 2007, WanderPolo filed an answer. The answer does not assert a counterclaim for the claimed outstanding legal fees.

At some point, Judge McVeigh recused herself leaving for my consideration the two pending motions.

## I.

I address first the motion for reconsideration. At the outset, I note that WanderPolo does not claim that Judge McVeigh over-

looked controlling decisions or erred in deciding that each side was responsible for payment of their own legal fees. *See R.* 4:49–2 and *Cummings v. Bahr,* 295 *N.J.Super.* 374, 382, 685 *A.*2d 60 (App. Div.1996). Given this omission, I am not persuaded that I am deciding a motion for reconsideration. Instead, the motion before me is, simply put, an attempt by WanderPolo to obtain payment of her fees from defendant's share of the estate. That issue was never decided by Judge McVeigh. Accordingly, I need not consider defendant's contention that the motion fails to satisfy *R.* 4:49–2 both procedurally and substantively, nor grapple with the fact that Judge McVeigh recused herself.

■ WanderPolo contends that she is seeking an award of fees "in a probate action" as authorized by *R.* 4:42(9)(a)(3). I disagree. *R.* 4:42(9)(a)(3) authorizes an allowance for legal fees where the will or codicil is contested. Where probate is granted, *R.* 4:42–9(a)(3) would permit a court, in its discretion, to make an allowance to be paid out of the estate. The parties acknowledge, as did Judge McVeigh, that up until November 2003 the litigation, and the legal fees incurred, related to the contest over the validity of the will and, under *R.* 4:42–9(a)(3), the court had the power to make an allowance for fees to both the proponent and the contestants to be paid out of the estate. Subsequently, the litigation, and the legal fees incurred, related to the joint accounts litigation.[3] That litigation was purely about recovery of the *inter vivos* transfers. It was not about whether probate would be granted or refused. Indeed, the services rendered by WanderPolo to defendant served only one purpose—to allow defendant to retain the *inter vivos* transfers. Thus, I conclude that those services do not satisfy the criteria for payment of legal fees in a probate action under *R.* 4:42–9(a)(3).

---

[3] The fees sought are for legal services rendered from June 2004 through July 2005. The amount is $48,093.47. To the best of my knowledge, the outstanding fees relate to services rendered in the joint accounts litigation.

WanderPolo also contends that even though a court can apportion fees against an executrix, the estate attorney is still entitled to be paid from the estate funds, at least to the extent of the executrix's share. She relies on the holding in *Estate of Vayda*, 184 *N.J.* 115, 875 *A.2d* 925 (2005) for the proposition that the estate is to be the sole source for payment of the estate's legal fees. WanderPolo's reliance on *Vayda* is misplaced. *Vayda* held only that the prevailing litigant was limited to recovering her attorneys fees from the estate, if the Chancery Division determined such recovery was appropriate under *R.* 4:42–9(a)(3), and that the fee could not be shifted to the losing party. *Vayda* does not hold that legal fees can only be paid from the estate where there is an absence of legal authority to order payment from the estate.

Next, it is argued by WanderPolo that her fees can be paid from defendant's share of the estate pursuant to *R.* 4:42–9(a)(2). That rule gives me discretion to make an allowance of fees to be paid "out of a fund in court." *Ibid.* " 'In order for an attorney to be entitled to compensation for his services from a "fund in court" he must have aided directly in creating, preserving or protecting the fund. He is not entitled to such an award if his client sues merely for his own interest or benefit.' " *In re Will of Landsman*, 319 *N.J.Super.* 252, 272, 725 *A.2d* 90 (App.Div.1999) (quoting *Shilowitz v. Shilowitz*, 115 *N.J.Super.* 165, 188, 278 *A.2d* 517 (Ch.Div.1971), *modified*, 119 *N.J.Super.* 311, 291 *A.2d* 383 (App.Div.), *certif. denied*, 62 *N.J.* 72, 299 *A.2d* 70 (1972)). In the present case, WanderPolo was compensated for her services up to the joint accounts litigation. Indisputably, those services benefited the estate. By contrast, the services she provided in the joint accounts litigation were designed to reduce the size of the estate. That distinction is important. Accordingly, I reject her assertion that in the joint accounts litigation she was rendering legal services "out of a fund entrusted to the fiduciary for administration." *R.* 4:42–9(a)(2).

There is also no merit to WanderPolo's argument that *N.J.S.A.* 3B:14–23(1) confers a jurisdictional basis for me to compel payment of her legal fees from defendant's share of the estate. That statute simply empowered defendant as executrix to employ and compensate an attorney for services rendered to the estate or to the executrix in the performance of her duties as executrix. It does not summarily adjudicate entitlement to legal fees for services that were not rendered to either the estate or the executrix in the performance of her duties. Nor does it confer a jurisdictional basis to either adjudicate the legal fee claim or compel payment of the legal fees from the executrix' share of the estate. The argument that defendant's entitlement to one-fifth of the estate constitutes a recovery generated by WanderPolo's representation is specious. Defendant's entitlement to one-fifth of the estate flows from the terms of the will, not WanderPolo's representation.

WanderPolo next argues that it is fundamentally wrong to allow an executrix to enter into a consent order, agreeing to pay the fees of an attorney she retained from the estate pursuant to *N.J.S.A.* 3B:14–23(*l* ), while at the same time assisting the executrix in avoiding payment of those same fees. Indeed, the often-quoted maxim is "he who seeks equity must do equity." From Wander-Polo's viewpoint, equity dictates that where a court has surcharged the executrix for the estate attorneys fees incurred pursuant to *N.J.S.A.* 3B:14–23(*l* ), the court should ensure payment of those fees from the executrix's share of the "fund in court," and not punish the attorney where, in hindsight, the court determines the services benefited the executrix more than the estate.

The argument is based on a false premise. Suffice it to say that WanderPolo mischaracterizes the August 31, 2006 consent order as an agreement by defendant to pay her legal fees from her share of the estate. The order does not amount to an agreement by defendant to either pay her fees out of her share of the estate or waive her right to dispute the fees she seeks. It serves only as

consent for the entry of a written order memorializing Judge McVeigh's decision, which denied plaintiffs' application for payment of their legal fees and for removal of defendant as executrix. Consequently, there is no merit to WanderPolo's argument that defendant's refusal to pay her fees is in derogation of her responsibility to abide by the consent order.

Equally unpersuasive is WanderPolo's claim that defendant's opposition to her fee request and to compelling payment of the fees from either the estate or defendant's share of the estate is designed to punish her. I refuse to equate punishment with defendant's exercise of her right, as a former client, to contest the fees sought by her former counsel.

Relying on *U.S. Pipe & Foundry v. United Steelworkers of America,* 37 *N.J.* 343, 181 *A.*2d 353 (1962) and *Tooker v. Hartford,* 136 *N.J.Super.* 572, 347 *A.*2d 371 (App.Div.1975), WanderPolo argues that the only forum where her legal fees claim can be adjudicated is before me. I disagree. These cases hold only that where an application is made for fees involving litigation in both the trial court and the Appellate Division, the fee application for services in the trial court is made to the trial court and the fee application for services in the Appellate Division is made in the Appellate Division. Neither case supports the argument that only I can decide a fee application for services rendered in the joint accounts litigation, nor does either case authorize or provide jurisdiction for me to adjudicate legal fees arising out of the joint accounts litigation where substantively and procedurally I lack jurisdiction to adjudicate the claim for the legal fees after November 2003.

 Next, it is argued by WanderPolo that defendant's refusal to pay her legal fees from her share of the estate is in derogation of the beneficiaries' right to have the executrix minimize the estate taxes due upon the estate.[4] She asserts that payment of her fee,

---

[4] At oral argument, the parties agreed that the estate is subject to New Jersey estate taxes.

even if surcharged to defendant, would serve to substantially reduce the estate tax paid by all of the beneficiaries. I decline to accept the argument that she urges. To do so would potentially subject both defendant and her attorney to sanctions under the Frivolous Claims Statute, *N.J.S.A.* 2A:15–59.1 and *R.* 1:4–8. Indeed, defendant's fiduciary duties as executrix to deduct all attorneys fees related to the estate do not require or permit her as a litigant, nor defendant's attorney, to advocate positions that have no reasonable basis in fact or law simply for the expediency of the estate taking a tax deduction for legal fees.

## II.

I turn now to the cross-motion seeking partial temporary restraints on the distribution of defendant's share of the estate and a charging lien pursuant to *N.J.S.A.* 2A:13–5. In support of the cross-motion, WanderPolo argues that until the fee dispute is litigated, defendant, as executrix, should be restrained from distributing her share of the estate to the amount of the unpaid legal fees. I disagree with this argument.

It has been suggested by defendant that WanderPolo is improperly seeking a pre-judgment attachment on her share of the estate. In *Delaware River & Bay Auth. v. Hunter Constr., Inc.,* 344 *N.J.Super.* 361, 781 *A.*2d 1126 (Ch.Div.2001), the court observed:

Equity should and does intervene when it can prevent the injury which would otherwise give rise to an action for money; it can not and should not intervene to insure that the money will be available.

More than that, a pre-judgment restraint against the dissipation of assets is functionally equivalent to a pre-judgment attachment of those assets. The Legislature has already provided for that remedy in certain very limited circumstances delineated in the statutes providing for pre-judgment statutes. *N.J.S.A.* 2A:26–1 *et. seq.*

[*Id.* at 368, 781 *A.*2d 1126.]

Needless to say, "attachment is an 'extraordinary remedy *in rem* for the collection of an ordinary debt by seizure of the property of the debtor,'" *Wolfson v. Bonello,* 270 *N.J.Super.* 274,

289, 637 *A*.2d 173 (App.Div.1994) (quoting *Russell v. Fred G. Pohl Co.*, 7 *N.J.* 32, 39, 80 *A*.2d 191 (1951)), and may only be issued where there is a probability of success on the merits and the enumerated statutory criteria are satisfied.

The attachment statute, *N.J.S.A.* 2A:26–1 –16, is the sole source of the attachment remedy. *Tanner Assocs., Inc. v. Ciraldo*, 33 *N.J.* 51, 53, 161 *A*.2d 725 (1960). Because pre-judgment attachment of assets is an extraordinary remedy, the availability of which is narrowly circumscribed by statute, both the statute and the court rules proscribing the procedure for seeking pre-judgment attachment must be strictly construed. *Ibid.*

*N.J.S.A.* 2A:26–2 provides in pertinent part:

An attachment may issue out of the Superior Court upon the application of any resident or nonresident plaintiff against the property, real and personal, of any defendant in any of the following instances:

a. Where the facts would entitle plaintiff to an order of arrest before judgment in a civil action;

b. Where the defendant absconds or is a nonresident of this State, and a summons cannot be served on him in this State;

c. Where the cause of action existed against a decedent, which survives against his heirs, devisees, executors, administrators or trustees, and there is property in this State which by law is subject to plaintiff's claim;

d. Where plaintiff has a claim of an equitable nature as to which a money judgment is demanded against the defendant, and the defendant absconds or is a nonresident and a summons cannot be served upon him in this State; or

e. Where the defendant is a corporation created by the laws of another state but authorized to do business in this State and such other state authorizes attachments against New Jersey corporations authorized to do business in that state.

[*Ibid.*]

It is readily apparent that paragraphs "b" through "e" do not apply. Defendant is a resident of New Jersey, has not absconded, and can be served with process in New Jersey. WanderPolo's cause of action is not asserted against the decedent. Defendant is an individual, not a corporation.

To demonstrate that paragraph "a" is also inapplicable requires an analysis of when someone is entitled to an order of arrest prior to judgment in a civil action. An order of arrest in a civil action is

governed by *N.J.S.A.* 2A:15–41 (tort actions) and *N.J.S.A.* 2A:15–42 (contract actions). As the claim for legal fees is a contractual action, *N.J.S.A.* 2A:15–42 is the relevant statute and provides:

A capias ad respondendum shall issue in an action founded upon contract, express or implied, due to plaintiff from defendant, only when the proof establishes the particulars specified in one or more of the following subparagraphs:

a. That defendant is about to remove any of his property out of the jurisdiction of the court in which the action is about to be commenced or is then pending with intent to defraud his creditors; or

b. That defendant has property or choses in action which he fraudulently conceals; or

c. That defendant has assigned, removed or disposed of, or is about to assign, remove or dispose of, any of his property with intent to defraud his creditors; or

d. That defendant fraudulently contracted the debt or incurred the demand.

[*Ibid.*]

The motion record is devoid of any evidence that defendant is about to remove her property from the jurisdiction; that she possesses property or choses in action which she fraudulently concealed; that she has or is about to assign, remove, or dispose of any property with intent to defraud her creditors; or that she fraudulently contracted the debt. In short, there is no basis whatsoever for the issuance of an order for arrest and, thus, no grounds for imposition of a pre-judgment attachment of assets under *N.J.S.A.* 2A:26–2(a) exist.

WanderPolo offers only sheer conjecture that defendant can avoid paying her fees by removing the funds to a foreign jurisdiction if the restraints are lifted. That defendant could remove funds to a foreign jurisdiction is neither proof of a reasonable, objective, fact-based apprehension that defendant will or is about to remove funds to a foreign jurisdiction, nor is it a claim that is unique to defendant. Obviously, in the age of wire transfers of funds, any person can remove assets to a foreign jurisdiction to avoid paying a claimed contractual debt. Accordingly, I conclude that there is no legal basis for a pre-judgment attachment.

The request must also be denied for procedural defects. WanderPolo has failed to comply with the procedure for seeking a pre-judgment attachment of assets. A writ of attachment re-

quires the filing of a complaint. *R.* 4:60–2. The failure to file a complaint is fatal to an application for the issuance of a writ of attachment. *Wolfson, supra,* 270 *N.J.Super.* at 291, 637 *A.*2d 173.

Nor is WanderPolo entitled to injunctive relief under *Crowe v. DeGioia,* 90 *N.J.* 126, 447 *A.*2d 173 (1982). WanderPolo does not satisfy the criteria under *Crowe* to obtain preliminary injunctive relief. First, she has not established a meritorious claim that bears a likelihood of success. Besides providing representative examples of her objections to the quantum of fees, defendant has brought a legal malpractice suit against WanderPolo. That lawsuit is pending. "Ordinarily, an attorney may not collect attorney fees for services negligently performed. In addition, a negligent attorney is responsible for the reasonable legal expenses and attorney fees incurred by a former client in prosecuting the legal malpractice action. Those are consequential damages that are proximately related to the malpractice." *Saffer v. Willoughby,* 143 *N.J.* 256, 272, 670 *A.*2d 527 (1996). Under the circumstances present, I cannot conclude that there is a likelihood of success on the merits.

Secondly, WanderPolo cannot establish irreparable harm if the partial temporary restraints are denied. Denial of the restraints sought will only mean that she, like every other attorney who sues a client for legal fees, will be required to file a counterclaim, proceed to judgment, then execute on the judgment if she is successful. Harm is generally considered irreparable if it cannot be redressed adequately by monetary damages. *Crowe, supra,* 90 *N.J.* at 132–33, 447 *A.*2d 173. The availability of adequate monetary damages belies a claim of irreparable injury supporting an injunction. *Delaware River & Bay Auth., supra,* 344 *N.J.Super.* at 364, 781 *A.*2d 1126. WanderPolo necessarily fails to establish irreparable harm where her claim is solely for monetary damages.

WanderPolo also argues that she is entitled to a charging lien under *N.J.S.A.* 2A:13–5 on defendant's share of the estate.

*N.J.S.A.* 2A:13–5, commonly known as the Attorney's Lien Act, provides:

> After the filing of the complaint or third-party complaint or the service of a pleading containing a counterclaim or cross-claim, the attorney or counsellor at law, who shall appear in the cause for the party instituting the action or maintaining the third-party claim or counterclaim or cross-claim, shall have a lien for compensation, upon his client's action, cause of action, claim or counterclaim or cross-claim, which shall contain and attach to a verdict, report, decision, award, judgment or final order in his client's favor, and the proceeds thereof in whose hands they may come. The lien shall not be affected by any settlement between the parties before or after judgment or final order, nor by the entry of satisfaction or cancellation of a judgment on the record. The court in which the action or other proceeding is pending, upon the petition of the attorney or counsellor at law, may determine and enforce the lien.

The lien "is intended to protect attorneys who do not have actual possession of assets against clients who may not pay for services rendered." *Martin v. Martin,* 335 *N.J.Super.* 212, 222, 762 *A.*2d 246 (App.Div.2000). The lien is "rooted in equitable considerations, and its enforcement is within the equitable jurisdiction of the courts." *Id.* at 222, 762 *A.*2d 246.

In *H & H Ranch Homes, Inc. v. Smith,* 54 *N.J.Super.* 347, 148 *A.*2d 837 (App.Div.1959), the court concluded that the following procedures be employed where the determination or enforcement of an attorney's lien is sought under *N.J.S.A.* 2A:13–5:

> The attorney should make application to the court, as a step in the proceeding of the main cause, by way of petition, which shall set forth the facts upon which he relies for the determination and enforcement of his alleged lien. The petition shall as well request the court to establish a schedule for further proceedings which shall include time limitations for the filing of an answer by defendants, the completion of pretrial discovery proceedings, the holding of a pretrial conference, and the trial. The court shall, by order, set a short day upon which it will consider the application for the establishment of a schedule. A copy of such order, together with a copy of the petition, shall be served upon defendants as directed by the court. The matter should thereafter proceed as a plenary suit and be tried either with or without a jury in the Law Division, depending upon whether demand therefor has been made. R.R. 4:39–1 et seq., or without a jury if the venue of the main cause is laid in the Chancery Division. In no event should the matter be tried as a summary proceeding.
>
> [*Id.* at 353–54, 148 *A.*2d 837.]

None of the procedural safeguards mandated by *H & H Ranch Homes* were followed here.

Beyond that, WanderPolo's right to a charging lien is questionable. Defendant's entitlement to one-fifth of the estate is not derived from her representation but from the will. The fees she seeks relate to the joint accounts litigation. It can hardly be considered representation of the estate when the services she provided related to litigation which would have greatly reduced the size of the estate if successful.

WanderPolo correctly observes that in *In re Niles*, 176 *N.J.* 282, 823 *A.*2d 1 (2003), our Supreme Court held that when an executor commits the pernicious tort of undue influence, an exception to the American Rule is created that permits the estate to be made whole by assessment of all reasonable counsel fees against the fiduciary that were incurred by the estate. *Id.* at 300, 823 *A.*2d 1. The situation presented in Niles, however, is far different from that presented here. That case does not address a situation where, as here, the fiduciary's attorney is seeking a restraint on the distribution of the fiduciary's share of the estate under the guise of a charging lien. Most significant, WanderPolo is not attempting to make the estate whole by assessing fees incurred by the estate against the fiduciary.

Despite the several theories advanced by WanderPolo to support her contention that she is entitled to have her fees adjudicated in this litigation and paid from defendant's share of the estate, she has failed to show that her claim is anything other than a routine claim for legal fees alleged to be due and owing from a former client. Accordingly, the proper forum for adjudication of her claim is in the pending legal malpractice suit where all aspects of the controversy between the parties can be tried together. That result is mandated by both the entire controversy doctrine and by the mandatory counterclaim rule. *R.* 4:7–1.

For all of these reasons, the motion and cross-motion are denied.